*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BOBBI LEE SMITH,

        Plaintiff/Counterdefendant-Appellant,

v

BRYAN LEON SMITH,

        Defendant/Counterplaintiff-Appellee.

UNPUBLISHED
June 13, 2024

No. 367261
Calhoun Circuit Court
LC No. 2022-000582-DM

Before: BOONSTRA, P.J., and FEENEY and YOUNG, JJ.

PER CURIAM.

Plaintiff appeals by right the portion of the judgment of divorce (JOD) entered by the trial court giving the parties joint legal and joint physical custody of their four minor children, as well as the trial court's calculation of defendant's income for the purposes of the Uniform Child Support Order (UCSO). We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

The parties were married in March 2007. They had four children together and separated in February 2022, after an altercation in which defendant held plaintiff down, used her finger to unlock her phone, and temporarily kept her from leaving their bedroom. Plaintiff filed a complaint for divorce as well as motions for temporary custody of the children, exclusive use of the marital home, and a mutual restraining order. After a hearing on the matter, the trial court issued an order granting the parties joint legal custody of the children, granting defendant temporary physical custody of the children and plaintiff parenting time, and granting defendant exclusive possession and use of the marital home. Several months later, plaintiff moved the trial court to order counseling for two of the children. At the hearing on plaintiff's motion, the trial court was informed that defendant had moved out of the marital home and into a home newly purchased by his girlfriend. Plaintiff asked to move back into the home. The trial court granted plaintiff's motion, ordering the children to counseling, instructing defendant to have what property he wanted removed from the marital home, at which time plaintiff would be allowed to move back into the home.

-1-

The parties' divorce bench trial was held over three days beginning in January 2023. Relevant to this appeal, testimony established that both parties were involved to varying degrees in the children's education, and that three of the children were average to below average academically but behaved like typical elementary and middle school children. The eldest child was in high school and had failed four classes, two of them being core classes that he needed for graduation. Plaintiff expressed concerns that defendant was sharing details of the divorce and other legal matters with the children. Defendant testified that he did not talk to the children about the divorce; rather, he responded to the children's questions about the divorce and soothed their fears with age-appropriate answers.

Plaintiff also believed that it was inappropriate that the children had seen and read the Lethality Assessment Program (LAP) form that she filled out when she reported defendant to the police for domestic violence. The purpose of the form was to help the police assess the likelihood that defendant would harm plaintiff. Plaintiff learned that the children had been exposed to the LAP when she received a screenshot from the eldest child's phone showing the children's comments and signatures on the form. Plaintiff said that the children should not have been exposed to her answers or to how scared she was that day. She did not believe defendant's account that he left the form on the table and that the children found the form and took it upon themselves to write comments on it and sign it. Defendant maintained that the children wrote on it, signed it, and sent a screenshot of it to plaintiff without his knowledge and that he talked to them about it once he found out what they had done.

An extensive portion of the trial was devoted to the parties' financial contributions to the marriage. Defendant testified that he had worked about 18 jobs in 16 years. He was a truck driver. Whenever he would find a better offer, he would leave one job, take a few days off, and then start the better job. Defendant estimated that his and plaintiff's incomes had been about the same for most of the marriage, but that for the last five or six years he had made about $38,000 each year, while she had made between $50,000 and $60,000. He believed that they had contributed "pretty equally" to household bills and utilities.

By contrast, plaintiff testified that she had worked at the same job for nearly 10 years and was a manager. She testified that the family had suffered financial hardship, that defendant was not a good provider, and that she could not depend on him for financial support. Plaintiff admitted into evidence three years of tax returns showing that she had made more than $90,000 in 2018, more than $70,000 in 2019, and more than $77,000 in 2020. During the same years, defendant had losses of more than $700, $1250, and $6,276, respectively. Testimony from plaintiff's mother and plaintiff's cousin's fiancée supported her testimony regarding defendant's financial contributions to the family. Plaintiff's cousin testified that defendant worked hard whenever he had a job.

Communication and co-parenting were also an issue. Although the parents had temporary joint legal custody of the children, defendant did not consult with plaintiff about medical decisions, such as defendant's decision to select his own primary care physician for one of the children or to have another child seen by a different eye doctor, nor did he provide plaintiff with insurance information. Plaintiff testified that she learned of upcoming medical appointments by accident, and then would have to contact the provider to get information. Defendant admitted to receiving text messages from plaintiff, but he believed that if plaintiff had the information available to her

through providers, then there was no reason for him to respond and tell her the same thing. Defendant also testified that he had recently subscribed to My Family Wizard, a domestic relations and coparenting messaging program. He believed that subscribing to this application showed that he was willing to communicate.

After the parties' closing arguments and before ruling from the bench, the trial court interviewed the children. The trial court noted on the record that the children were very open and appeared to be well-adjusted. The trial court granted the parties a divorce. The trial court then concluded that the children had an established custodial environment with both parents. The trial court next found that the parties were equal in all but two of the best-interest factors. Regarding defendant's alleged commission of domestic violence against plaintiff leading to their separation, the trial court said that it would consider it under the Factor (k), but it would not "give it a great consideration being the fact that nothing happened and it did not come to fruition in any way."

The court found that Factor (j) (each parent's willingness to facilitate the children's close and continuing relationship with the other parent) slightly favored plaintiff, and that Factor (*l*) (any other factor considered relevant by the court) slightly favored defendant. To determine Factor (*l*), the trial court surveyed the trial testimony that did not fit neatly under any of the other best-interest factors, and then gave dispositive weight to two events. In one instance, one of the children would not stop playing with his gaming device, and plaintiff took it from him and threw it against the wall. In the other instance, the eldest child hit one of his siblings. When plaintiff tried to talk to him about it, he walked away from her and went to his room. Plaintiff followed him, continuing to try to talk to him. When he did not appear to be listening, she "smacked" him on the arm. He instinctively threw his arm up, and his hand "caught her lip" and bloodied it.

The trial court awarded the parties joint legal and joint physical custody. The trial court also told defendant that when faced with a medical decision for the children, he must discuss it with plaintiff. If the two could not agree on an important decision, they must bring the matter to the court for resolution.

For purposes of calculating child support, the trial court considered defendant's testimony that he earned $26.32 per hour in his current job, and plaintiff's testimony and exhibits reflecting her income. The trial court noted defendant's testimony that he earned incentives when he finished his route early, but observed that there was no testimony about the amounts earned, so the court did not take any incentives into consideration. This appeal followed.

## II. STANDARD OF REVIEW

"All custody orders must be affirmed on appeal unless the circuit court's findings were against the great weight of the evidence, the circuit court committed a palpable abuse of discretion, or the circuit court made a clear legal error on a major issue." MCL 722.28. "The great weight of the evidence standard applies to all findings of fact." *Hunter v Hunter*, 484 Mich 247, 257; 771 NW2d 694 (2009). The trial court's findings under this standard must be affirmed unless the evidence clearly preponderates in the other direction. *Mitchell v Mitchell*, 296 Mich App 513, 519; 823 NW2d 153 (2012). "[T]his Court reviews questions of law for clear legal error. A trial court commits clear legal error when it incorrectly chooses, interprets, or applies the law." *Bofysil v Bofysil*, 332 Mich App 232, 242; 956 NW2d 544 (2020) (quotation marks and citation omitted).

"Due deference 'shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.' MCR 2.613(C)." *Bowers v Bowers*, 198 Mich App 320, 324; 497 NW2d 602 (1993).

We review a trial court's findings regarding the best-interest factors under the great-weight-of-the evidence standard, MCL 722.28, and a trial court's ultimate custody decision for an abuse of discretion, *McRoberts v Ferguson*, 322 Mich App 125, 133-134; 910 NW2d 721 (2017). "A trial court abuses its discretion on a custody matter when its decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Zawilanski v Marshall*, 317 Mich App 43, 48; 894 NW2d 141 (2016) (quotation marks and citation omitted).

We review child support orders for an abuse of discretion. *Clarke v Clarke*, 297 Mich App 172, 178-179; 823 NW2d 318 (2012). This Court reviews de novo as a question of law whether the trial court properly applied the Michigan Child Support Formula (MCSF). *Ewald v Ewald*, 292 Mich App 706, 714; 810 NW2d 396 (2011). This Court reviews the trial court's factual findings for clear error, and the court's discretionary rulings for an abuse of discretion. *Id*. at 714-715. A trial court abuses its discretion in this regard when it selects an outcome outside the range of reasonable and principled outcomes. *Id*. at 715. An abuse of discretion also occurs "when it relies on a legally improper reason for departing from the MCSF in establishing a parent's child support obligation." *Id*.

III. ESTABLISHED CUSTODIAL ENVIRONMENT

Plaintiff argues that the trial court's finding that the children had an established custodial environment with defendant was against the great weight of the evidence. We disagree.

A child has an established custodial environment "if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c). An established custodial environment is one

> of significant duration in which a parent provides care, discipline, love, guidance, and attention that is appropriate to the age and individual needs of the child. It is both a physical and a psychological environment that fosters a relationship between custodian and child and is marked by security, stability, and permanence. [*Bofysil*, 332 Mich App at 242 (quotation marks and citation omitted).]

In determining whether an established custodial environment exists, the factors that a trial court may consider "include '[t]he age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship.' " *LaFleche v Ybarra*, 242 Mich App 692, 696; 619 NW2d 738 (2000), quoting MCL 722.27(1)(c). "An established custodial environment may exist in more than one home . . . ." *Marik v Marik*, 325 Mich App 353, 361; 925 NW2d 885 (2018) (quotation marks and citation omitted).

The trial court's finding that the children had an established custodial environment with both parents is not against the great weight of the evidence. The trial court found that both parties had attempted to provide the children with guidance, comfort, and discipline. The record shows that both parents were involved in the children's education and were responsive to their school's

concerns. Both parents attempted to provide guidance and comfort to the children. Except for plaintiff's concerns that the parties' eldest child found it necessary to console defendant when defendant was faced with a potentially serious medical issue, there was not a great deal of testimony about the children's relationship with each parent. However, the testimony there was supports the trial court's finding that the children had an established custodial environment with both parents.

Plaintiff does not identify particular evidence that she believes preponderated against the trial court's finding that an established custodial environment existed with both parents. Rather, she speculates that any established custodial environment that the children had with defendant was destroyed by defendant's inappropriate sharing, emotionality, and the fact that he moved out of the marital home and into a new home with his new girlfriend. Plaintiff contends that, given these circumstances, the children could not reasonably have an expectation of security, stability, and permanence while in his custody. Plaintiff relies for support on *Baker v Baker*, 411 Mich 567, 573; 309 NW2d 532 (1981), and *Bowers*.

Neither *Baker* nor *Bowers* supports plaintiff's position. Both cases involved repeated changes in custody and significant geographical relocations that are not present in this case. Here, the trial court's April 2022 temporary order granted the parties joint legal custody and granted defendant physical custody of the children. After that, the children lived with defendant in the marital home and spent weekends with plaintiff at her mother's home. In late 2022, defendant and the children moved into a nearby home newly purchased by defendant's girlfriend. Plaintiff moved back into the marital home in January 2023. This case saw no changes in custody after the trial court's April 2022 order, and no significant geographical moves. The mere fact that the children moved to a new home with their father did not, without more, destroy the established custodial environment. See *Sinicropi v Mazurek*, 273 Mich App 149, 180-181; 729 NW2d 256 (2006). Plaintiff has not pointed to any evidence that clearly preponderates against the trial court's finding that the children had an established custodial environment with both parents. Accordingly, we conclude that the trial court's determination regarding the children's established custodial environment was not against the great weight of the evidence. *Mitchell*, 296 Mich App at 519.

## IV. BEST-INTEREST FINDINGS

Plaintiff also argues that the trial court's findings regarding five of the best-interest factors were against the great weight of the evidence and that the factors clearly favored her. In addition, she contends that the trial court committed clear legal error in its ruling on the domestic-violence factor, MCL 722.23(k). We disagree.

Above all other considerations, trial courts must resolve custody disputes by determining what is in the child's best interests, as measured by the factors set forth in MCL 722.23. See *Eldred v Ziny*, 246 Mich App 142, 150; 631 NW2d 748 (2001). A child's best interests means the "sum total" of all the factors stated under MCL 722.23. The trial court must consider each relevant factor and explicitly state its findings and conclusions regarding the factor. See *Rittershaus v Rittershaus*, 273 Mich App 462, 475; 730 NW2d 262 (2007). "[A] trial court's findings on each factor should be affirmed unless the evidence clearly preponderates in the opposite direction." *Kubicki v Sharpe*, 306 Mich App 525, 542; 858 NW2d 57 (2014).

The trial court found that the parties were equal with regard to best-interest Factors (a) through (h), and the court interviewed the children for purposes of Factor (i). The trial court considered Factor (k) but gave it little weight, found that Factor (j) slightly favored plaintiff, and found that Factor (*l*) slightly favored defendant. Plaintiff challenges the trial court's findings on Factors (d), (e), (f), (k), and (*l*).

Factor (d) refers to "[t]he length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity." MCL 722.23(d). Factor (e) looks at "[t]he permanence, as a family unit, of the existing or proposed custodial home or homes." MCL 722.23(e). "This factor exclusively concerns whether the family unit will remain intact, not an evaluation about whether one custodial home would be more acceptable than the other." *Ireland v Smith*, 451 Mich 457, 462; 547 NW2d 686 (1996) (quotation marks and citation omitted). The trial court noted that plaintiff lived in and was purchasing the marital home and that there did not "appear to be any changes in that particular home." The trial court also noted defendant's testimony that he was residing in a home that he and his girlfriend purchased in November 2022 and that his name would be—but was not yet—on the deed. The trial court also observed that regardless of whether defendant's name was on the deed, there had been no testimony about any future change or possible change in living arrangements. On the basis of this reasoning, the trial court weighed Factor (d) equally. Similarly, based on its finding that there were no "proposed or possible changes" to plaintiff's or defendant's family unit in the near future, the trial court weighed Factor (e) equally.

Plaintiff asserts that Factor (d) should have favored her, because the children were familiar with the marital home and she had previously provided a stable and satisfactory environment, whereas defendant's relationship with his girlfriend was new and it was unclear how stable it was or how long it would last. It is true that the children had lived longest in the marital home. However, it is also true that, after the separation, the element of continuity was provided by defendant. Stability and continuity can be with a person, not just with a locale. See *Sinicropi*, 273 Mich App at 180-181. Plaintiff's argument that the children were not living in a stable and satisfactory environment rests purely on speculation regarding defendant's relationship with his girlfriend. However, defendant testified the first day of trial that the two had been dating for seven months and that his girlfriend was more than a "romantic interest," that it was "definitely love," and that they had a "very high standing agreement" about the house. Further, although plaintiff argues that, without knowing how many children defendant's girlfriend has and whether they live with her and defendant, the court could only speculate as to the permanence of defendant's family unit, defendant testified that no one else lived in the house but him, his children, and his girlfriend.

The trial court appears to have credited defendant's testimony, and this Court typically defers "to the trial court's credibility determinations, given its superior position to make these judgments." *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011)[1]. For these reasons, we conclude that plaintiff has not shown that the evidence preponderated against the trial court's

---

[1] The trial court noted that it made a credibility assessment at trial due to inconsistent and contradictory testimony. Although not stated expressly, the court's rulings throughout the case indicate that the court found defendant to be credible.

finding that Factors (d) and (e) favored both parties equally. See *Pennington v Pennington*, 329 Mich App 562, 570; 944 NW2d 131 (2019).

Factor (f) considers "[t]he moral fitness of the parties involved." MCL 722.23(f). This factor evaluates the parties' moral fitness only as it relates to how they will function as a parent and not as to who is the morally superior adult. *Fletcher v Fletcher*, 447 Mich 871, 887; 526 NW2d 889 (1994). The trial court noted that there had been testimony regarding a single instance of domestic violence. The court indicated that it would consider domestic violence under Factor (k). Consequently, the trial court weighed Factor (f) equally. Plaintiff argues that the trial court committed clear legal error by stating that domestic violence was not considered under Factor (f). Plaintiff has cited no authority for her position. In the absence of any legal requirement that the trial court consider domestic violence under Factor (f) rather that (k), plaintiff has not shown that the trial court committed clear legal error by declining to consider the domestic-violence incident under Factor (f). See *Bofysil*, 332 Mich App at 242.

Factor (k) considers "[d]omestic violence, regardless of whether the violence was directed against or witnessed by the child." MCL 722.23(k). Regarding this factor, the trial court indicated that it would consider the incident that resulted in defendant's being charged with domestic violence, but it would not "give it a great consideration being the fact that nothing happened and it did not come to fruition in any way." Presumably, the trial court's statement refers to the fact that the domestic-violence incident for which defendant was charged was dismissed before the pretrial stage. Plaintiff argues that the trial court's finding was against the great weight of the evidence and that the court committed clear legal error by requiring a domestic violence conviction under this factor. However, in context, the trial court's comments merely indicate that the fact that the charges were dismissed was part of its consideration of how much weight to give the incident. In other words, the lack of legal consequences was a reason for not giving the domestic violence much weight, not a reason for not considering it.

Although the trial court did not say which parent the factor favored, it is reasonable to infer from the court's acknowledgment of domestic violence that this factor slightly favored plaintiff. Assuming that the court found that this factor favored plaintiff, the court was not required to give equal weight to all the factors when making its ultimate custody determination. See *Sinicropi*, 273 Mich App at 184. Nor was the court required to give dispositive weight to any one factor. See *McCain v McCain*, 229 Mich App 123, 131; 580 NW2d 485 (1998). The trial court's findings regarding this factor were not against the great weight of the evidence. *McRoberts*, 322 Mich App at 133-134. The record shows that the trial court considered both defendant's conduct and the lack of legal consequences for that conduct in considering this factor.

Lastly, Factor (*l*) considers "[a]ny other factor considered by the court to be relevant to a particular child custody dispute." MCL 722.23(*l*). The trial court briefly surveyed testimony that did not fit neatly into any of the other categories and, on the basis of the gaming device and bloodied-lip incidents described earlier, it concluded that the factor slightly favored defendant. Although plaintiff takes issue with the trial court's weighing of this factor in favor of defendant on the basis of these two incidents, they are the only incidents involving either parent acting aggressively toward any of the children. Plaintiff has not shown that the trial court's finding that Factor (*l*) slightly favored defendant was against the great weight of the evidence. *McRoberts*, 322 Mich App at 133-134.

We conclude that plaintiff has not shown that the trial court's assessment of the disputed best-interest factors was against the great weight of the evidence or that the trial court's ultimate custody determination was so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias. See *Zawilanski*, 317 Mich App at 48.

V. CHILD SUPPORT

Plaintiff additionally argues that the trial court erred by not correctly applying the MCSF for the imputation of income to a parent who is voluntarily unemployed or underemployed. She also argues that the trial court erred by not including incentives in defendant's income. We disagree.

When calculating child support, the first step is to determine each parent's individual incomes. Income includes, among other things, "[w]ages, overtime pay, commissions, bonuses, or other monies from all employers as a result of any employment (usually, as reported in the Medicare, wages, and tips section of the parent's W-2)." 2021 MCSF 2.01(C)(1). "When a parent is voluntarily unemployed or underemployed, or has an unexercised ability to earn, income includes the potential income that parent could earn, subject to that parent's ability." 2021 MCSF 2.01(G). Section 2.01(G)(2) provides a list of facts for the court to consider when determining both "whether the parent in question has an actual ability to earn and a reasonable likelihood of earning the potential income."

However, "[i]mputation is not appropriate where an individual is employed full time (35 hours per week or more), but has chosen to cease working additional hours (such as leaving a second job or refusing overtime)." 2021 MCSF 2.01(G)(1)(b). The record in the present case strongly suggests that defendant was currently employed full-time. Defendant testified that he earned incentives "every day" before he was injured, that he has a substantial benefits package that includes a "national HMO plan," dental insurance, and "extra life benefits," and that the possibility existed for him to be "the lead driver." These circumstances suggest full-time employment, and there was no indication in the record that defendant's work as a truck driver was ever part-time while he was working—rather, it seems that he would have periods of unemployment between trucking jobs. Accordingly, the trial court did not clearly err by not imputing income to defendant beyond that earned through his current trucking job.

Plaintiff also contends that the trial court should have imputed incentives earned by defendant in the calculation of defendant's income. Defendant testified that he had the potential to earn incentives for delivering items in less time than billed and that he had earned incentives every day before he broke his finger. The MCSF's "objective for determining net income is to establish, as accurately as possible, how much money a parent should have available for support. All relevant aspects of a parent's financial status are open for consideration when determining support." 2021 MCSF 2.01(B). The incentives that defendant earned certainly seem to be contemplated in the MCSF's definition of income as including "[w]ages . . . bonuses, or other monies from all employers as a result of any employment . . . ." 2021 MCSF 2.01(C)(1).

However, the record strongly suggests that defendant had not earned any incentives after he was injured in late 2022 or early 2023. He began the job in October 2022, and he testified on

the first day of trial in January 2023 that he was on workers' compensation because he broke his finger. He testified on the third day of trial in July 2023 that he had been back in the truck for only a couple of weeks and that he was restricted to lifting no more than 35 pounds. Defendant also testified that he anticipated being cleared to lift 50 pounds at his upcoming doctor's appointment. It was not clear from this testimony whether or when defendant would be in a position to earn incentives again. One of the factors that courts must consider before imputing income is whether the individual can actually earn the imputed income. 2021 MCSF 2.01(G). Although defendant had the opportunity to earn incentives, he did not have the actual ability to earn incentives because of his injury. In light of these circumstances, the trial court's finding that defendant's income did not include potential incentives was not clearly erroneous. *Bofysil*, 332 Mich App at 242.

Affirmed.

/s/ Mark T. Boonstra
/s/ Kathleen A. Feeney
/s/ Adrienne N. Young